Gerald H. FLEISCHFRESSER, et al., Plaintiffs–Appellants,

v.

DIRECTORS OF SCHOOL DISTRICT 200, a Body Politic and Corporate, Defendant–Appellee.

No. 92–3674.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1993.

Decided Feb. 2, 1994.

682

Robert V. Gildo, Wheaton, IL, for plaintiff-appellant.

Lawrence J. Weiner, Anthony G. Scariano, Justino D. Petrarca, John D. Dalton, Lisa A. Rapacz, Scariano, Kula, Ellch & Himes, Chicago, IL, John M. Izzo (argued), Scariano, Kula, Ellch & Himes, Chicago Heights, IL, for defendant-appellee.

Before BAUER, EASTERBROOK, and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

Parents of students enrolled in grades Kindergarten through Five in Lowell Elementary School of School District 200 in Wheaton, Illinois, brought this action to enjoin the directors of the school district from continuing to use the Impressions Reading Series as the main supplemental reading program for these grades. The parents claim the use of this series violates the Establishment and Free Exercise Clauses of the First Amendment. The directors filed a motion to dismiss the complaint, which the district court treated as a motion for summary judgment, and the district court dismissed the action. We affirm.

## I. Facts and Procedural History

The school district has included the Impressions Reading Series in its curriculum since February 1988. The parents claim that the Lowell Elementary School has used this series as a "supplemental reading program" and will continue to "teach, instruct and otherwise educate the students" with this series. The parents allege that the series "fosters a religious belief in the existence of superior beings exercising power over human beings by imposing rules of conduct, with the promise and threat of future rewards and punishments," and focuses on supernatural beings including "wizards, sorcerers, giants and unspecified creatures with supernatural powers." [1] The parents also claim that use of the series "indoctrinates children in values directly opposed to their Christian beliefs by teaching tricks, despair, deceit, parental disrespect and by denigrating Christian symbols and holidays." They cast these allegations in the form of violations of the Establishment and Free Exercise Clauses of the First Amendment.

The parents filed this action in the Circuit Court of DuPage County, Illinois, and the directors removed it to the district court. The district court granted the directors' first motion to dismiss and granted the parents leave to file an amended complaint. Then, the directors moved the district court to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6). Because the parents had only appended excerpts of the series to their amended complaint, the district court asked them to provide the complete series, which they did. Finally, after reviewing the series, the district court dismissed the parents' action.

## II. Standing

The parents, not the students by their parents, have brought this suit. Therefore, as a threshold matter, we must determine whether the parents have standing to raise these claims; if the parents lack standing to bring this suit, we do not have jurisdiction to consider it. *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Harris v. City of Zion*, 927 F.2d 1401 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 897 (1992). To satisfy constitutional standing requirements, the parents must allege "personal injury fairly traceable to the [directors'] challenged conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. In this case, we must be sure that the parents are raising rights personal to them and not the rights of their children.

The parents have standing to challenge alleged violations of the Establishment Clause of the First Amendment if they are directly affected by the government action, here, the use of the series. Courts have recognized that parents have standing as a result of their right to direct the religious training of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963); *McCollum v. Board of Educ.*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Mozert v. Hawkins County Bd.*, 827 F.2d 1058 (6th

---

1. These two quotes are taken from paragraph nine of the parents' amended complaint. This is the most concrete allegation of the establishment of a religion in the amended complaint. The parents do a much better job of describing the religion they believe is endorsed through the use of the series in their Brief to this court; unfortunately for the parents, the allegations in the amended complaint are all that matter at this stage. As we will discuss, this lack of specificity causes us some trouble in evaluating the parents' claims.

Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988); *Grove v. Mead Sch. Dist. No. 354,* 753 F.2d 1528, 1532 (9th Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985). Consistent with these other cases, we hold that the parents have standing to raise their claim alleging a violation of the Establishment Clause because the impermissible establishment of religion might inhibit their right to direct the religious training of their children.

▪ With respect to the alleged violation of the Free Exercise Clause, the parents have standing only if they claim infringement of their personal religious freedom. *McGowan v. Maryland,* 366 U.S. 420, 429, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393 (1961). One aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Grove,* 753 F.2d at 1531. In this case, the parents have a direct, personal right to direct their children's religious training. *See Grove,* 753 F.2d at 1531; *Collins v. Chandler Unified Sch. Dist.,* 644 F.2d 759, 764 n. 1 (9th Cir.), *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). Therefore, the parents have standing to bring this claim as well.

### III. Rules 12(b)(6) and 56

▪ We now turn to the parents' claim that the district court improperly converted the directors' motion to dismiss to a motion for summary judgment. As we have discussed, the district court's order responded to the directors' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The district court did not explicitly notify the parties that it

was treating the directors' motion to dismiss as one for summary judgment. Further, the district court, in its abbreviated opinion, did not label its decision as one for summary judgment. The district court did consider, however, material extraneous to the pleadings—the entire reading series. From our vantage point, we can see that the district court did, in fact, treat the motion as one for summary judgment, and our task is to determine whether the parents have been prejudiced by this treatment.

Rule 12(b) commands that if a district court considers material that is not included in the pleadings, the district court must treat the motion to dismiss as one for summary judgment.[2] The parents do not claim that the series was a part of their amended complaint. Moreover, both parties agreed, in arguments to both the district court and to this court, that the evaluation of the entire series was critical to the resolution to the parents' claims. So, while the district court did not explicitly inform the parties of its obligation to treat the motion to dismiss as one for summary judgment, both parties had every reason to know that extraneous material was being considered and are held to know that Rule 12(b)(6) compelled the district court to consider the motion to dismiss as one for summary judgment. The parents, then, cannot claim surprise.

In addition, the district court's failure to provide explicit notice is not fatal to its decision in this case. *See Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 377 (7th Cir.1987); *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 280–81 (7th Cir.1986); *Milwaukee Typographical Union No. 23 v.*

---

**2.** Rule 12(b) provides that:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The Advisory Committee Notes on Rule 12(b) amplify the text of the rule:

> The addition at the end of subdivision (b) makes it clear that on a motion under Rule

12(b)(6) extraneous material may not be considered if the court excludes it, but that if the court does not exclude such material the motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56. It will also be observed that if a motion under Rule 12(b)(6) is thus converted into a summary judgment motion, the amendment insures that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proofs to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment.

*Newspapers, Inc.*, 639 F.2d 386, 391 (7th Cir.), *cert. denied*, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 119 (1981); *Chicago–Midwest Meat Assoc. v. City of Evanston*, 589 F.2d 278, 281–82 (7th Cir.1978), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). "Although a district court certainly should give notice to the parties when the court converts a 12(b)(6) motion into a motion for summary judgment, the failure to do so does not necessarily mandate reversal where nothing else could have been raised to alter the entry of summary judgment." *Malak*, 784 F.2d at 281. Further, "a potentially disputed material issue of fact must exist to justify reversal of a trial judge's decision to convert a motion to dismiss into a summary judgment where he fails to give the parties notice of his intention to convert the motion." *Farries*, 832 F.2d at 377 (citing *Milwaukee Typographical*). Therefore, if the district court's decision to grant summary judgment for the directors is correct, its decision to treat the Rule 12(b)(6) motion as one for summary judgment without giving the parties explicit notice was not improper.

We review *de novo* a district court's grant of summary judgment. *Doe v. Allied–Signal Inc.*, 925 F.2d 1007, 1008 (7th Cir.1991). Our task is to determine whether the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Further, we "must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991) (citations omitted).

In their filings in the district court, the parents claim that the series is used as a "supplemental reading program" and that the series will continue to be used to "teach, instruct and otherwise educate the students." In their brief, however, the parents also al-

lege that the students are required "to prepare and cast chants and spells and to practice being witches."[3] The directors contend that the parents fail to allege at all that the students even read the passages in the series deemed offensive by the parents. We think that, in reviewing the record and drawing all inferences in favor of the parents, the students are occasionally assigned a reading from the series, which may or may not be a story that might be considered offensive by the parents, and even more occasionally, teachers lead a class discussion on an offensive reading.

The district court properly determined that parents base their claims solely on the series itself. As such, a review of the entire series, which both parties desire, is sufficient to resolve the parents' claims, and no further evidence is required to evaluate the parents' claims. Therefore, there is no genuine issue of any material fact. We must now evaluate the substance of the parents' claims to determine whether the directors are entitled to judgment as a matter of law.

## IV. The Establishment Clause

■ The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I, cl. 1. The Establishment Clause requires government neutrality with respect to religion. *Abington Sch. Dist.*, 374 U.S. at 215, 83 S.Ct. at 1567. It was intended to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)).

■ The Supreme Court has generally, but not exclusively, analyzed alleged violations of the Establishment Clause in the framework of the three-part test set forth in

---

**3.** The parents argued at oral argument that the phrase "teach, instruct and otherwise educate" encompasses these other activities. We disagree. While we understand that our federal rules are designed to accommodate and encourage notice pleading, we believe that an allegation of a re-

quirement to participate in "pagan" rituals is sufficiently different from an allegation of using a "supplemental reading series" to "teach, instruct and otherwise educate" that it should be separately and specifically pled.

*Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Our recent decisions in Establishment Clause cases acknowledge that any doubt as to the vitality and applicability of the *Lemon* test was extinguished by the Supreme Court in *Lamb's Chapel v. Center Moriches Sch. Dist.*, —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). *See, e.g., Sherman v. Community Consol. Sch. Dist. 21*, 8 F.3d 1160 (7th Cir. 1993); *Cohen v. City of Des Plaines*, 8 F.3d 484 (7th Cir.1993); *Gonzales v. North Township*, 4 F.3d 1412 (7th Cir.1993). According to the *Lemon* test, for a challenged state action to pass constitutional muster, it must: (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster excessive state entanglement with religion. 403 U.S. at 612–13, 91 S.Ct. at 2111. Governmental action violates the Establishment Clause if it fails to meet any of these three criteria. *Stone v. Graham*, 449 U.S. 39, 40–41, 101 S.Ct. 192, 193–194, 66 L.Ed.2d 199 (1981), *Berger v. Rensselaer Central Sch. Corp.*, 982 F.2d 1160, 1171 (7th Cir.1993); *Harris*, 927 F.2d at 1411.

■ Before we apply the *Lemon* test, we believe that there are several preliminary issues that merit discussion. As an initial matter, we are mindful that alleged violations of the Establishment Clause in elementary school settings "present heightened concerns for courts." *Sherman*, 8 F.3d at 1164. The Supreme Court has made this clear in its treatment of similar cases. In *Grand Rapids Sch. Dist. v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985), the Court stated: "The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as free and voluntary choice." *See also Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992) (noting heightened concerns of "subtle coercive pressure in the elementary public schools"); *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987) (stating that the sources of this coercive power are "mandatory attendance, ... students' emulation of teachers as role models, and the

children's susceptibility to peer pressure"). Therefore, we must be "vigilant in monitoring compliance with the Establishment Clause in elementary ... schools." *Sherman*, 8 F.3d at 1164 (quoting *Edwards*, 482 U.S. at 583–84, 107 S.Ct. at 2577).

■ We are also mindful, however, that this heightened concern is balanced to a great degree by the broad discretion of a school board to select its public school curriculum. *See, e.g., Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Further, this court is to inject itself in a controversy regarding the daily operation of this school system only if basic constitutional values are "directly and sharply implicate[d]." *Id.* at 104–05, 89 S.Ct. at 270–71; *see Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806–07, 73 L.Ed.2d 435 (1982) ("[T]he discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment."). Thus, we will strike down the use of the reading series only if its use in this instance clearly violates the First Amendment.

In the context of this balance between the parents' rights and the directors' discretion, courts have held a number of activities to be violations of the Establishment Clause. These include: 1) inviting clergy to offer invocation and benediction prayers at formal graduation ceremonies for high schools and middle schools, *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649; 2) daily readings from the Bible, *Abington Sch. Dist.*, 374 U.S. 203, 83 S.Ct. 1560; 3) daily recitation of the Lord's Prayer, *id.*; 4) distributing Gideon Bibles to fifth grade public school students, *Berger*, 982 F.2d 1160; 5) posting the Ten Commandments in every classroom, *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192; 6) requiring the teaching of evolution science with creation science or not at all, *Edwards*, 482 U.S. 578, 107 S.Ct. 2573; 7) beginning school assemblies with prayer, *Collins*, 644 F.2d 759; and 8) teaching a Transcendental Meditation course that includes a ceremony involving offerings to a deity, *Malnak v. Yogi*,

592 F.2d 197 (3d Cir.1979). Courts have not been inclined to find a violation of the First Amendment, however, with respect to the use of certain books in a public school curriculum. These cases deal with novels, textbooks, and reading series, including the Impressions Reading Series at issue in the instant case. *See Grove*, 753 F.2d 1528 (involving a novel assigned in a tenth grade English class); *Smith v. Board of Sch. Comm'rs*, 827 F.2d 684 (11th Cir.1987) (concerning the use of elementary and secondary school textbooks in the areas of history, social studies, and home economics); *Mozert*, 827 F.2d 1058 (involving a reading series used in grades one through eight); *Brown v. Woodland Joint Unified Sch. Dist.*, No. S–91–0032, 1992 WL 361696 (E.D.Cal. April 2, 1992) (deciding a case involving the very reading series at issue in the instant case). Moreover, even the Bible itself may be used in public schools to teach literary and historical lessons, *Abington Sch. Dist.*, 374 U.S. at 225, 83 S.Ct. at 1573. It may have been the long odds against a party alleging the Establishment Clause violation regarding the use of books in public schools that caused the parents to reframe their allegations in their brief so that they appear to align with the "religious activities" cases mentioned earlier. But, as we noted above, we do not consider the allegations in the brief that the students are required to practice being witches; we only consider the allegations in the parents' pleadings below.

Finally, before the *Lemon* test can be applied, we must first determine whether there is even an issue of establishment of religion. *See Gonzales*, 4 F.3d at 1417. While the parents and their children may be sincerely offended by some passages in the reading series, they raise a constitutional claim only if the use of the series establishes a *religion.* The parents insist that the reading series presents religious concepts, found in paganism and branches of witchcraft and satanism; this hardly sounds like the establishment of a coherent religion.[4] Notwithstanding our skepticism, we hold that even if this allegation suffices to raise a colorable claim of an Establishment Clause violation with respect to the religion requirement, the directors are entitled to judgment as a matter of law. We will address, though, the aspects that trouble us with respect to the way in which the parents' claims are framed.

■ The First Amendment prohibits the establishment of religion but does not define religion. There seems to be an unresolved issue as to whether the definition of religion should be the same for the Establishment Clause as it is for the Free Exercise Clause. While one view believes that one definition will suffice, another view sees only one definition as absolutely unworkable. *Compare Everson v. Board of Educ.*, 330 U.S. 1, 32, 67 S.Ct. 504, 519, 91 L.Ed. 711 (1947) (Rutledge, J. dissenting) (" 'Religion' appears only once in the [First] Amendment. But the word governs two prohibitions and governs them alike. It does not have two meanings, one narrow to forbid 'an establishment' and another, much broader, for securing 'the free exercise thereof.' 'Thereof' brings down 're-ligion' with its entire and exact content, no more and no less...."); *with Grove*, 753 F.2d at 1537 (Canby, J. concurring) ("While a generous functional (and even idiosyncratic) definition best serves free exercise values, the same expansiveness in interpreting the establishment clause is simply untenable in an age of such pervasive governmental activity.").

This is not much of a problem when referring to the recitation of the Lord's Prayer, readings from the Bible, and the distribution of Gideon Bibles, *i.e.* when "traditional religions" are at issue. The problem is evident where, as here, the "religion" that is allegedly being established is much less widespread or cohesive. Where a district court has before it one who swears or (more likely) affirms that he sincerely and truthfully holds certain beliefs which comport with the gener-

---

4. The parents even attempt to include in these "religions" a tenet of what the parents call "parental disrespect." Even as we give wide latitude to the parents in construing the religion requirement in this case, we cannot abide the argument that the inclusion of "humorous stories" in which "a child outwits a parent" serves to establish these religions.

al definition of religion,[5] we are comfortable those beliefs represent his "religion."[6] In this case, however, the district court had and we have before us a party claiming that the use of a collection of stories, a very few of which resonate with beliefs held by some people, somewhere, of some religion, has established this religion in a public school. This allegation of some amorphous religion becomes so much speculation as to what some people might believe. This amorphous character makes it difficult for us to reconcile the parents' claim with the purpose of the Establishment Clause.

In addition, this "religion" that is allegedly being established seems for all the world like a collection of exercises in "make-believe" designed to develop and encourage the use of imagination and reading skills in children that are the staple of traditional public elementary school education. The purpose of the series, stated by the publisher in promotional materials about the series, is that the inclusion of a variety of stories serves to stimulate a child's senses, imagination, intellect, and emotions; according to the publisher, this is the best way to build reading skills. This reading series includes works of C.S. Lewis, A.A. Milne, Dr. Seuss, Ray Bradbury, L. Frank Baum, Maurice Sendak and other noted authors of fiction. Further, these works, and so many others that are part of any elementary classroom experience[7] have one important characteristic in common; they all involve fantasy and make-believe to a significant degree. The parents would have us believe that the inclusion of these works in an elementary school curriculum represents the impermissible establishment of pagan religion. We do not agree. After all, what would become of elementary education, public or private, without works such as these and scores and scores of others that serve to expand the minds of young children and de-velop their sense of creativity? With that off our chest, we can now properly dispose of the parents' claim within the structure of the Lemon test.

■ "The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion." Edwards, 482 U.S. at 585, 107 S.Ct. at 2578 (quoting Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring)). It is in this phase of our analysis that we recognize the broad discretion vested in the school board to select its public school curriculum. Government action is improper where there is no secular purpose to support it, but to determine that there is no secular purpose, we must find that the action was "motivated wholly by religious considerations." Lynch, 465 U.S. at 680, 104 S.Ct. at 1362.

In this case, the parents have not alleged that the purpose of using the series is exclusively religious. But even if they had, there is a clear secular purpose. As we noted above, public school curricula traditionally rely on fantasy and "make-believe" to hold a student's attention to develop reading skills and to instill a sense of creativity and imagination. That this particular series relies on witches and goblins in a few stories to develop the children's minds fits the norm.[8] As a result, we hold that the directors' use of the series has a secular purpose.

■ With respect to the second leg of the Lemon test, government action is proper if its primary effect is neither to advance nor inhibit religion. In order for government action to constitute an impermissible advancement of religion, that action must amount to an endorsement of religion. Lynch, 465 U.S. at 681, 104 S.Ct. at 1363. We are concerned, of course, with the effect

---

5. A general working definition of religion for Free Exercise purposes is any set of beliefs addressing matters of "ultimate concern" occupying a " 'place parallel to that filled by . . . God' in traditionally religious persons." Welsh v. United States, 398 U.S. 333, 340, 90 S.Ct. 1792, 1796, 26 L.Ed.2d 308 (1970).

6. This might be a typical scenario with respect to a claim of a Free Exercise violation.

7. As was suggested at oral argument, other works might include the works of J.R.R. Tolkien and Lewis Carroll and tales regarding, for example, the Tooth Fairy.

8. Many of the stories involving witches are sequenced to emphasize a Halloween theme. The American tradition of celebrating the eve of All Saints' Day is certainly a secular one.

on the elementary school students of using the Impressions Readings Series.[9] Further, in evaluating the primary effect of the use of the series, we must focus on the entire series, not simply the passages the parents find offensive because to "[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation." *Id.* at 679–80, 104 S.Ct. at 1362.

■■■ The stories which the parents contend are offensive are a relatively small minority when compared with the series as a whole. Further, the series is also comprised of some stories, also in a small minority, which presumably are consistent with the parents' Catholic and Protestant beliefs, including "The Best Christmas Pageant Ever," "How Six Found Christmas," and "The Twelve Days of Christmas." But, it is not enough that certain stories in the series strike the parents as reflecting the religions of Neo–Paganism or Witchcraft, or reference Christian holidays. The Establishment Clause is not violated because government action "happens to coincide or harmonize with the tenets of some or all religions." *Harris v. McRae,* 448 U.S. 297, 319, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980) (citing *McGowan v. Maryland,* 366 U.S. 420, 422, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961)). In this case, the primary or principal effect of the use of the reading series at issue is not to endorse these religions, but simply to educate the children by improving their reading skills and to develop imagination and creativity. Any religious references are secondary, if not trivial. Therefore, the use of the series withstands scrutiny under this prong of the test.

■■■ The parents also claim that because a curriculum review committee reviewed the series before it was purchased, the directors became entangled with religion. This claim is without merit. School boards have broad discretion in determining curricula in their schools. Surely, the mere exercise of this discretion cannot constitute excessive entanglement with religion. Further, there is no

allegation that the publisher of the reading series is a religious organization or that the directors are in some way dealing with a particular religious organization. Nothing, then, supports a claim that the use of this reading series constitutes excessive entanglement with religion.

## V. The Free Exercise Clause

■■■ Having disposed of the parents' Establishment Clause claim, we now turn to their claim that the use of the series interferes with the free exercise of their religion. The Free Exercise Clause recognizes the right of every person to choose among types of religious training and observance, free of state compulsion. *Abington Sch. Dist.,* 374 U.S. at 222, 83 S.Ct. at 1571. Further, this right includes the right of parents to control the religious upbringing and training of their minor children. *Yoder,* 406 U.S. at 230–31, 92 S.Ct. at 1540–41. The parents claim that the use of the series prevents them from meeting their religious obligation to teach specific values to their children.

■■■ We analyze this claim by balancing the burden upon the exercise of the parents' religion and the government's interest in using the series to educate elementary school students. *Id.* at 214, 92 S.Ct. at 1532; *Menora v. Illinois High Sch. Assoc.,* 683 F.2d 1030, 1033 (7th Cir.1982), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983). "The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989); *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533 (describing the required government interest as one "of the highest order"). With respect to the burden on the parents' religion, the parents must show that the directors' use of the series has a coercive effect that operates against the parents'

---

9. While the parents urge us to adopt an "impressionable child" standard with respect to this component of the test, we decline to do so. The Supreme Court has never adopted that standard, and we are satisfied that our previous discussion of our heightened concerns regarding the elementary school context more than adequately frames this part of our analysis.

practice of their religion. *Abington Sch. Dist.*, 374 U.S. at 223, 83 S.Ct. at 1572.

▮ The burden to the parents in this case is, at most, minimal. The directors are not precluding the parents from meeting their religious obligation to instruct their children. Nor does the use of the series compel the parents or children to do or refrain from doing anything of a religious nature. Thus, no coercion exists, and the parents' free exercise of their religion is not substantially burdened.

▮ Even if we were to find that the parents' free exercise rights were somehow substantially burdened, we would find that the government interest outweighed such a burden. Providing public school education "is at the apex of the function of [government]." *Yoder*, 406 U.S. at 213, 92 S.Ct. at 1532. We have discussed that the Impressions Reading Series is used to build and enhance students' reading skills and develop their senses of imagination and creativity. These skills are fundamental to children of this age, and it is critical that the directors select the best tools available to them to teach these skills. Having done this, they have properly performed the government's function of providing quality public school education.[10]

This is not to say that we doubt the sincerity of the parents' religious beliefs or that they are not genuinely offended by the passages. We do agree, however, with Justice Jackson's statement that: "If we are to eliminate everything that is objectionable to any [religious group] or inconsistent with any of their doctrines, we will leave public schools in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits." *McCollum v. Board of Educ.*, 333 U.S. 203, 235, 68 S.Ct. 461, 477, 92 L.Ed. 649 (1948) (Jackson, J. concurring). Therefore, we find that the government's interest in providing a well-rounded education would be

critically impeded by accommodation of the parents' wishes, and we hold that this interest is sufficient to override the burden on the parents' free exercise of their religion.

## VI. Conclusion

This case involves no genuine issue of any material fact and the directors are entitled to judgment as a matter of law. Therefore, the district court's decisions to convert the motion to dismiss to one for summary judgment and the grant of summary judgment were proper. For these reasons and those expressed in the body of this opinion, the decision of the district court is

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court in the comprehensive and thoughtful opinion of Judge Bauer. I write separately to emphasize that our decision today does not in any way dilute the protections of either of the religion clauses for those individuals—and there are many in our society—who adhere to a creed that some might characterize as nontraditional.

When the religion clauses were drafted, we were, in terms of our religious practices, a nation of little white churches. Although religious bigotry and discrimination were considerable, the range of religious beliefs and practices found among the population certainly can be described as "traditional." Today, we are a far more diverse people in terms of our religious beliefs and practices, and it is important for us to keep in mind that the constitutional protections of the religion clauses protect with equal vigor those who adhere to beliefs and practices that do not fit comfortably into the traditional "little white church." Indeed, it is usually adherents of these "non-mainstream" religions who are in most need of the Amendment's protection.

10. In addition, "tolerance of divergent political and religious views" while taking into account "the sensitivities of others" is among the values public education seeks to instill in its students. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681, 106 S.Ct. 3159, 3163, 92 L.Ed.2d 549 (1986). To the extent that there is any religious message in the offensive passages, the use of the series simply helps the directors meet their obligation to teach the value of tolerance as well as build the skills previously mentioned.

As Judge Bauer cogently demonstrates, these considerations are not in jeopardy in this case. On the record before us,[1] it is clear that we are not dealing with a religion, even when that term is defined broadly to encompass nontraditional beliefs and practices. The parents here may have good cause to question the professional judgments of the educators who decided to use the literature at issue as an instructional tool, but it is not reasonable to characterize the material, at least as it is presented on this record, as religious in nature.

---

1. As Judge Bauer points out, we do not have before us an effort on the part of the educators to require the students to participate in ritual exercises of a religious nature. *Cf. Malnak v. Yogi,* 592 F.2d 197 (3d Cir.1979) (holding unconstitutional the teaching of transcendental meditation in a course that included a ceremony in which the students made offerings to a deity).