94 F.3d 1223
 96 Cal. Daily Op. Serv. 6279, 96 Daily Journal
D.A.R. 10,338,
96 Daily Journal D.A.R. 11,498
Raquel ALVARADO; Sylvia Beadleston; Anne Collett; Roger
Litwin; Gerry Litwin; Manuel Salazar,
Plaintiffs-Appellants,
v.
CITY OF SAN JOSE, a California Municipal Corporation;
Redevelopment Agency of the City of San Jose,
Defendants-Appellees.
 No. 95-15519.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 15, 1996.
Decided Aug. 23, 1996.
As Amended Sept. 19, 1996.
 
 J. Thomas Diepenbrock, United States Justice Foundation, Milpitas, California, for plaintiffs-appellants.
 Clifford S. Greenberg, Deputy City Attorney, San Jose, California, for defendants-appellees.
 Appeal from the United States District Court, for the Northern District of California, James Ware, District Judge, Presiding. D.C. No. CV-94-20773-JW.
 Before: T.G. NELSON and TASHIMA, Circuit Judges, and BURNS,* District Judge.
 T.G. NELSON, Circuit Judge:
 
 
 1
 Raquel Alvarado ("Alvarado") and others appeal the district court's summary judgment in favor of the City of San Jose and the City Development Agency (collectively, "the City"), in their 42 U.S.C § 1983 action alleging that the City's installation and maintenance of the "Plumed Serpent" sculpture in a city park violated the Establishment Clause of the First Amendment and Articles I § 4 and XVI § 5 of the California Constitution. The district court concluded that while the statue had "religious significance," it did not promote or endorse religion in violation of either the state or federal constitutions. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the judgment.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 In 1991, an art committee ("the Committee") formed by the City of San Jose approached renowned Hispanic artist Robert Graham ("Graham") regarding the commission of a sculpture to commemorate Mexican and Spanish contributions to the City's culture.[1] Graham proposed a sculpture representing Quetzalcoatl, or the "Plumed Serpent," of Aztec mythology. The Committee chairman, City Councilmember Blanca Alvarado, responded enthusiastically to Graham's proposal, declaring the Plumed Serpent to be a symbol "universal in its celebration of ancient people," drawing on "mythology and history to link the essence of the past to the strength of the present Mexican American community." The Committee agreed that the City should commission the piece.
 
 
 3
 The Art in Public Places Advisory Panel ("the Panel") found the proposed work to be of significant artistic and cultural value and unanimously endorsed the Committee's recommendation. On September 8, 1992, the Visual Art Committee held a public hearing, received input from the community, and concurred in the Panel's endorsement of the sculpture. The Parks and Recreation Commission also reviewed the project as to its appropriateness for location within San Jose's Plaza Park. On September 15, 1992, the Urban Design Review Board considered and unanimously approved the staff recommendation for the location of the statue.
 
 
 4
 On December 3, 1992, the Redevelopment Agency Board ("the Board"), members of which also sit as the City Council, held a public hearing at which members of the public were given an opportunity to voice their opinions and concerns regarding the statue. None of the named plaintiffs spoke at the hearing. The Board unanimously approved an agreement with Graham on December 10, 1992. Under that agreement, the City agreed to pay the artist not more than $400,000 and to pay for the transportation and installation of a bronze and concrete sculpture, in the form of a coiled serpent, projected to weigh about 10 tons, to stand about 20' to 25' high, and to measure about 15' to 20' in diameter.
 
 
 5
 In the fall of 1993, the City Council ("the Council") held meetings to discuss renaming Plaza Park "Cesar Chavez Park." Around this time, controversy over the sculpture was heating up in the community. According to an article in the San Jose Mercury News, submitted by plaintiffs, the piece was initially opposed by certain Christians who associated the statue with the serpent from the Garden of Eden and by persons of Mexican ancestry who associated Quetzalcoatl with human sacrifice. Several members of the public, including three of the named plaintiffs, spoke out at one of the Council meetings in opposition to the Plumed Serpent project.
 
 
 6
 Contrary to some of its detractors, defenders of the sculpture maintain that Quetzalcoatl, or a priest by that name, was responsible for stopping the practice of human sacrifice. Disputants and historians agree that Quetzalcoatl was originally a Mesoamerican creator-deity represented by the Plumed Serpent, among other symbols, as early as 1200 B.C.; that Quetzalcoatl, also known as Kulkulcan, was worshipped in Aztec and Mayan cultures from about 100-300 A.D. until the time of the Spanish conquest; that in the tenth (some say the twelfth) century A.D., a fair-haired Aztec priest or ruler named Topiltzin adopted the name Quetzalcoatl and urged his followers to abandon the practice of human sacrifice; that five centuries later, some Aztecs took the fair-haired Spanish conquistador Fernando Cortes to be the reincarnation of Topiltzin-Quetzalcoatl; and that the Aztecs and their religion died out in the sixteenth century with the Spanish conquest of what is now Mexico. In dispute here is the current religious significance, if any, of Quetzalcoatl or the Plumed Serpent. Plaintiffs submit "New Age" and Mormon writings to support their claim that worship of this ancient deity is a going concern.
 
 
 7
 On July 8, 1994, a private organization called the United States Justice Foundation wrote to the City Attorney demanding that it terminate the Plumed Serpent project as an unconstitutional promotion of religion. On November 9, 1994, nine days before the scheduled dedication and unveiling of the sculpture, plaintiffs filed suit to enjoin the installation, dedication, and maintenance of the artwork on the grounds that it promotes religion in violation of the federal and state constitutions. Following a hearing, the district court denied the motion for a preliminary injunction on the basis of its finding that "the Plumed Serpent is an artistic representation of an ancient civilization and is not a religious object."
 
 
 8
 The statue was unveiled and dedicated two days later in a ceremony which included speeches by local dignitaries and performances by traditional Aztec dance and drum groups. Local elementary school students participated in the ceremonial procession to the sculpture. According to the plaintiffs, some observers laid offerings of flowers and food at the base of the statue, while others "ma[de] obeisance" to the statue and burnt incense. One of the plaintiffs found a business card left at the base of the statue bearing the handwritten words: "O Dei Quetzalcoatl/ May your many feathers loft our/ diverse (?) souls across the chasm of religious artifice."
 
 
 9
 On January 13, 1995, the City filed a motion for summary judgment. The district court conducted a hearing on February 10, 1995, and granted the City's motion, holding that the sculpture had secular purposes and did not promote religion in violation of either the state or federal constitutions. Judgment was entered for the City on February 23, 1995. Plaintiffs timely appeal.
 
 DISCUSSION
 
 10
 A grant of summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). The appellate court's review is governed by the same standard used by the trial court under Fed.R.Civ.P. 56(c). Jesinger, 24 F.3d at 1130.
 
 
 11
 Before turning to the issue of whether the statue violates the Establishment Clause, or the religion clauses of the California Constitution, we must first consider whether the object in question can be defined as "religious" for establishment purposes. See Fleischfresser v. Directors of Sch. Dist. 200, 15 F.3d 680, 687 (7th Cir.1994); Malnak v. Yogi, 440 F.Supp. 1284, 1312-13 (D.N.J.1977) (" Malnak I "), aff'd, 592 F.2d 197 (3d Cir.1979) (" Malnak II "). The district court found at the hearing that the statue had "some religious significance," but not enough to prove a constitutional violation. In its written order, the court stated that "[r]eligious significance [by itself] is ... insufficient to prove a constitutional violation."
 
 
 12
 Plaintiffs suggest that the City has conceded the issue, but this oversimplifies the City's position. While the City has admitted to confusion about the meaning of religion, and states in its brief that it does not want to argue about "what is or is not a religious symbol," it also avers that the "Plumed Serpent does not involve current religious beliefs" and asks this court to determine whether the Plumed Serpent is in fact a religious symbol for First Amendment purposes.
 
 
 13
 The City's confusion and trepidation are understandable. Attempting to define religion, in general and for the purposes of the Establishment Clause, is a notoriously difficult, if not impossible, task. See James M. Donovan, "God is as God Does: Law, Anthropology, and the Definition of 'Religion,' " 6 Seton Hall Const. L.J. 23 (1995) (reviewing courts' efforts to deal with the problem to date); and see Africa v. Pennsylvania, 662 F.2d 1025, 1031 (3d Cir.1981), cert. denied, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982) ("Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion within the meaning of the first amendment.").
 
 
 14
 While there is no question that Quetzalcoatl was at one time a religious figure, the parties agree that for First Amendment purposes, a symbol must have current religious adherents to be considered religious. Not surprisingly, there are no cases holding that a religious belief must be current to merit protection under the Free Exercise Clause or potentially to violate the Establishment Clause. Free Exercise cases generally involve claims brought by individuals or groups claiming to belong to a cognizable religion. Establishment cases usually, though not always, involve well-known religions, because these are most likely to generate the dangers the clause is designed to prevent. The issue with which we are presented is whether Quetzalcoatl or the Plumed Serpent has current religious significance. Plaintiffs have submitted a collection of New Age and Mormon writings to support their contention that belief in the symbol is current and active among these groups.
 
 
 15
 In several cases involving public school curricula, federal courts, including this one, have considered whether certain texts or class exercises embody the religious significance that opponents have ascribed to them. Peloza v. Capistrano Unified Sch. Dist., 37 F.3d 517, 520 (9th Cir.1994) (considering science teacher's charge that the school's requiring him to teach evolution was a violation of the Establishment Clause, and holding that neither evolution nor secular humanism may be defined as religion), cert. denied, --- U.S. ----, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995); Grove v. Mead Sch. Dist., 753 F.2d 1528, 1534 (9th Cir.) (considering but not deciding whether secular humanism is a religion), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985); and see Canby, J., concurring, id. at 1537 (suggesting that an organized group of Secular Humanists, but not secular humanism generally, might be considered religious for First Amendment purposes).
 
 
 16
 In Brown v. Woodland Joint Unified Sch. Dist., 27 F.3d 1373 (9th Cir.1994), we considered the religious significance of a school textbook, but did not reach the "definition of religion" question because the defendant School District did not challenge plaintiffs' description of the readings as invoking the Wicca religion. Id. at 1378. See also Fleischfresser, 15 F.3d 680, 687-89 (holding that school's use of reading series including stories and exercises concerning witchcraft did not "establish[ ] a religion "); Malnak I, 440 F.Supp. 1284, (holding that a course in transcendental meditation taught by Science of Creative Intelligence/Transcendental Meditation ("SCI/TM") practitioners, using texts and rituals that the court deemed religious, violated the Establishment Clause).
 
 
 17
 Plaintiffs rely on Malnak I for the proposition that the definition of religion for First Amendment purposes must be very broad. In oral argument, plaintiffs also urged us to consider Judge Adams' concurring opinion in Malnak II, 592 F.2d 197, discussed infra. In their briefs, plaintiffs repeatedly quote the following line from Malnak I: "[T]he Supreme Court has made clear that an activity may be religious even though it is neither a part of nor derives from a societally recognized sect." 440 F.Supp. at 1313. The Malnak I court made this statement in the course of a lengthy exegesis on the nature of religion, in the context of a case involving the teaching of SCI/TM to public high school students. The case was complicated by the fact that the SCI/TM defendants vehemently denied that their teachings constituted "religion."
 
 
 18
 The district court determined that SCI/TM was in fact a religious teaching, based mainly on its analysis of the textbook, which, while it did not mention God or any deity, spoke in spiritual terms of the creation of the universe and the ultimate goals of human existence, and asserted SCI/TM to be an exclusive moral teaching dedicated to creating a society of fellow believers. Id. at 1291-96. The court also deemed significant the requirement that each student attend a traditional Hindu ceremony at which the student and teacher recited prayers (in Sanskrit) praising various Hindu deities to whom they bowed down and offered presents. Id. at 1305-10. The disingenuousness of the SCI/TM defendants' efforts to deny the religious nature of their practice was underscored by the fact that the group had originally incorporated itself under a different name and had declared itself to be a religious organization. Id. at 1319.
 
 
 19
 The Malnak I court cited a number of Supreme Court cases to support its conclusion that even a small and unknown sect that denies its religious character may be defined as religious for purposes of the First Amendment. See id. at 1313-14 (citing Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (a school prayer case holding that prayers invoking even a "generic" God violated the Establishment Clause in this context); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (holding unconstitutional a statute requiring appointees to state office to profess a belief in God, because it discriminated against nonreligious persons and non-theistic religious persons);[2] and Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) and United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (conscientious objector cases defining "religion" broadly for purposes of statutory, rather than constitutional, construction)).
 
 
 20
 In affirming, the Third Circuit relied on the district court's reasoning without offering much comment of its own. See Malnak II, 592 F.2d at 198. Judge Adams wrote a detailed concurring opinion, id. at 200-15, reviewing traditional and contemporary legal definitions of religion and proposing three "helpful indicia"[3] to supplement the "definition by analogy" approach favored by the district court. Id. at 207-09. The Third Circuit explicitly adopted Judge Adams' approach in Africa, 662 F.2d at 1031, cert. denied, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982).
 
 
 21
 In Africa, the court used the "three useful indicia" guideline proposed in the Malnak II concurrence, 592 F.2d at 207-10, to decide that a prisoner claiming a Free Exercise exemption on the grounds that he was an adherent of MOVE had failed to show that his belief or practice was religious for First Amendment purposes. Id. at 1032-36. The test devised by Judge Adams, which plaintiffs implored us at oral argument to consider, is as follows:
 
 
 22
 First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.
 
 
 23
 Id. at 1032. The "formal and external signs" listed by the court include: "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions." 662 F.2d at 1035-36 (quotations omitted).
 
 
 24
 Review of the materials submitted by the plaintiffs concerning New Age beliefs leads us to conclude that neither Africa nor Malnak II supports the contention that there is a cognizable religious interest at issue here.[4] The texts presented are comprised mainly of writings by two authors, Jose Arguelles and Hunbatz Men, who are specifically concerned with Mayan culture and symbolism, and whose works are published by The Bear & Co., which plaintiffs describe as a New Age press. Plaintiffs also include excerpts from other writings which offer general definitions of the New Age "movement":
 
 
 25
 Some [New Agers] emphasize spiritual healing.... Other[s] are among the most ardent environmentalist.... Finally, there are the mystics of the movement, whose beliefs include ideas drawn from every religious tradition....
 
 
 26
 As the amazing variety shows, the New Age is a very flexible, amorphous, spontaneous movement. There is no national organization, no hierarchy, no clearinghouse for information. People become part of the movement by studying books, visiting small institutes, joining study groups, attending seminars, and working with the thousands of New Age therapists, teachers, healers, and gurus scattered around the country. A typical believer draws on these different interests to create his own, personal way of thinking about himself and the world around him.
 
 
 27
 (ER 380, from Michael D'Antonio, Heaven on Earth 17-18 (Crown Publishers, 1992) (emphasis added).)
 
 
 28
 [T]he New Age is large and complex and filled with millions of seekers.... If they were somehow brought together in a church-like organization, these serious and almost-serious New Agers would constitute the third largest religious denomination in America.
 
 
 29
 (ER 177, from id. at 13 (emphasis added).)
 
 
 30
 The New Age represents social, political, economic, psychological, and spiritual efforts to recognize and include all that our modern society has tended to exclude.
 
 
 31
 (ER 194, from David Spangler, Defining the New Age (emphasis added) (publisher information and page not given).)
 
 
 32
 The picture of the New Age that emerges is one of individual efforts to "find" or heal oneself, physically and spiritually, with the help of symbols drawn from an infinite store of texts, visual sources and "beliefs drawn from every religious tradition." (ER 380.) The New Age proponents cited by plaintiffs clearly indicate that there is no New Age organization, church-like or otherwise; no membership; no moral or behavioral obligations; no comprehensive creed; no particular text, rituals, or guidelines; no particular object or objects of worship; no requirement or suggestion that anyone give up the religious beliefs he or she already holds. In other words, anyone's in and "anything goes."
 
 
 33
 The texts by Messrs. Arguelles and Men do nothing to alter this picture. They refer specifically to Quetzalcoatl and the Plumed Serpent, from which they derive spiritual sustenance, but it is clear that the experience they describe is subjective, however much they may wish to share it. They refer to Quetzalcoatl in the past tense and describe him as a deity belonging to an ancient tradition. Even the bits quoted in the plaintiffs' brief are full of language signifying a subjective response: "the prophetic facts of the matter gave me the conviction that Quetzalcoatl was not just a local affair. Rather, I saw in Quetzalcoatl an invisible and immanent force underlying and transcending the mythic fabric of mechanization.... It occurred to me that [Quetzalcoatl] ... was himself an incarnation of Christ." (Appellants' brief at 14, quoting Jose Arguelles, The Mayan Factor, ER 283, 287 (emphasis added).) While Hunbatz Men implores his readers to believe that "we [Mexicans] are Quetzalcoatl" (ER 306), there is no indication that this is anything more than an individual's interpretation of his cultural heritage.[5]
 
 
 34
 We are hard put to imagine a more unworkable definition of religion or religious symbol or believer for purposes of the Establishment Clause or Free Exercise[6] than that which is offered here. Few governmental activities could escape censure under a constitutional definition of "religion" which includes any symbol or belief to which an individual ascribes "serious or almost-serious" spiritual significance. "[I]f anything can be religion, then anything the government does can be construed as favoring one religion over another, and ... the government is paralyzed...." 6 Seton Hall Const. L.J. at 70. While the First Amendment must be held to protect unfamiliar and idiosyncratic as well as commonly recognized religions, it loses its sense and thus its ability to protect when carried to the extreme proposed by the plaintiffs.
 
 
 35
 Plaintiffs' proposed identification of New Age beliefs with religion for Establishment Clause purposes does not stand up to either the majority analysis in Malnak II or Judge Adams' concurrence, which became the law of the Third Circuit in Africa. There is no text, creed or organized group such as the court considered in Malnak II, only a sculpture with which plaintiffs have associated a number of unrelated texts and statements of individual response to the work. Under Africa, the New Age concepts presented by the plaintiffs, while they invoke "ultimate concerns," fail to demonstrate any shared or comprehensive doctrine or to display any of the structural characteristics or formal signs associated with traditional religions. See 662 F.2d at 1032-36.
 
 
 36
 Plaintiffs also argue that the Plumed Serpent invokes Mormon religious beliefs. While Mormons are clearly a recognized religious group, the evidence presented by the plaintiffs does not support a First Amendment argument. The writings suggest that, according to certain Mormons, ancient worshippers of Quetzalcoatl were in fact worshipping Christ. Historically, Mormon missionaries taught that Christ had revealed himself to native Mesoamericans in the form of Quetzalcoatl or the Plumed Serpent long before he appeared to man in the human form known to Christians. This attribution of Christian or Christ-like qualities to ancient religious symbols and practices does not, however, create an inference that Mormons themselves worship Quetzalcoatl or the Plumed Serpent.
 
 
 37
 Plaintiffs also cite the speech given by Luis Valdez at the unveiling ceremony and to statements of Councilmember Blanca Alvarado, attesting to her own spiritual response to the piece and sharing her impressions of Aztec culture. Review of these statements reveals that they were made not in a religious spirit, but in homage to the City's Mexican heritage, and to the contribution of indigenous peoples to Mexican culture. It is commonplace that a work of art may affect someone on an emotional or spiritual level, or even "move [her] to tears." This does not imbue the work with religious content.
 
 
 38
 Finally, while we do not find plaintiffs' arguments concerning New Age or Mormon beliefs compelling, we must also consider the inference raised by the declaration of Professor Ronald Hilton, to the effect that "the worship and cult of Quetzalcoatl is making a resurgence among the Zapatistas, who are Mayan and revolutionaries in southern Mexico." (ER 358-59.) To address this inference, we turn to state and federal Establishment Clause jurisprudence.
 
 
 39
 A. The Establishment Clause of the United States Constitution.
 
 
 40
 According to the Supreme Court,
 
 
 41
 the Establishment Clause [has come] to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.
 
 
 42
 County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 590-91, 109 S.Ct. 3086, 3099-3100, 106 L.Ed.2d 472 (1989) (footnotes omitted). As the Court went on to explain, Establishment Clause principles have been "refine[d]" into the three-part " Lemon " test named for the Court's decision in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Allegheny, 492 U.S. at 592, 109 S.Ct. at 3100. "Under the Lemon analysis, a statute or practice which touches upon religion ... must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." Id. Though much maligned by scholars and various Justices, Lemon has never been overruled, and the Lemon test is the one applied in this circuit. Brown, 27 F.3d 1373, 1378; Kreisner v. San Diego, 1 F.3d 775, 780 (9th Cir.1993), cert. denied, 510 U.S. 1044, 114 S.Ct. 690, 126 L.Ed.2d 657 (1994). Because the plaintiffs do not make an entanglement argument and because they concede the secular purpose prong, we discuss only the effects prong of the Lemon test.
 
 
 43
 In Allegheny, a majority of the Supreme Court relied on the "endorsement" test introduced by Justice O'Connor in Lynch v. Donnelly, 465 U.S. 668, 691-92, 104 S.Ct. 1355, 1368-69, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). This test is closely related to the effects prong of the Lemon test, insofar as it concerns the government's alleged promotion of religion, whether apparent or intentional. See 492 U.S. at 592-94, 109 S.Ct. at 3100-01. "A government practice has the effect of impermissibly advancing or disapproving of religion if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices.' " Id. (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)); see also Kreisner, 1 F.3d at 782.[7]
 
 
 44
 In the case before us, plaintiffs have urged that the Plumed Serpent statue has the effect of advancing religion because of its alleged association with or resemblance to New Age and Mormon beliefs. As discussed above, however, plaintiffs have failed to raise an inference that the statue reflects Mormon beliefs or that the New Age, as characterized by plaintiffs, constitutes a discernible religion for purposes of Establishment Clause analysis. Plaintiffs' strained attempt to characterize the statue as religious on these bases does not imbue the piece with religious significance or give it the effect of promoting these beliefs.
 
 
 45
 Nor does any resemblance to the Zapatista's religious symbols or practices give the statue this impermissible effect. "[M]ere consistency with or coincidental resemblance to a religious practice does not have the primary effect of advancing religion." Brown, 27 F.3d at 1380. " '[I]t is not enough that certain stories in the series strike the [plaintiffs] as reflecting the religions of Neo-Paganism or Witchcraft.... The Establishment Clause is not violated because government action happens to coincide or harmonize with the tenets of some or all religions.' " Id. at 1381 (quoting Fleischfresser, 15 F.3d at 689).
 
 
 46
 Plaintiffs' argument that a "reasonable observer" might nevertheless perceive the statue to be a positive endorsement of religion is also unavailing. We have characterized " '[t]his hypothetical observer [as] informed as well as reasonable; we assume that he or she is familiar with the history of the government practice at issue.' " Id. at 1378 (quoting Kreisner, 1 F.3d at 784). The reasonable observer in this case would presumably be aware that the Plumed Serpent represents an ancient Aztec deity, as publicized by the City, and that the City-sponsored dedication ceremony included a performance by a Native American Aztec dance group.[8] None of these elements would lead the reasonable observer to infer an endorsement of religion on the part of the City. Plaintiffs argue in their reply brief that the informed observer would also be aware of the New Age and Mormon connections they have cited. We disagree. The reasonable observer is not an expert on esoteric religions, nor can he or she be turned into one by any publicity generated by plaintiffs' lawsuit. Furthermore, a reasonable observer cannot be expected to infer an endorsement of the religion practiced by a revolutionary group in southern Mexico.
 
 
 47
 As we stated in Kreisner, "[t]he First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent.... [T]he measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." 1 F.3d at 780. Because we find not even the shadow of a threat that the City has advanced religion here, we hold that the statue does not violate the Establishment Clause of the United States Constitution.
 
 B. State Constitutional Analysis
 
 48
 Plaintiffs argue that the City's sponsorship of the Plumed Serpent violates the "No Preference" Clause of Art. I § 4 as well as Art. XVI § 5 of the California Constitution.[9] "California courts have interpreted the No Preference Clause to require that the government neither prefer one religion over another nor appear to act preferentially." Brown, 27 F.3d at 1384 (citing Sands v. Morongo Unified Sch. Dist., 53 Cal.3d 863, 281 Cal.Rptr. 34, 45, 809 P.2d 809, 820 (1991), cert. denied, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992)). A plurality of the California Supreme Court noted that the No Preference Clause is "more protective of the principle of separation than the federal guarantee." Sands v. Morongo Unified Sch. Dist., 53 Cal.3d 863, 281 Cal.Rptr. 34, 45, 809 P.2d 809, 820 (1991), cert. denied, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992).
 
 
 49
 Even if the No Preference Clause of the California Constitution is deemed more protective of the principle of separation than the federal guarantee, there is no evidence, in light of the above, that the City has preferred one religion over another, or that it has appeared to do so. See Brown, 27 F.3d at 1384 (citing Sands, 281 Cal.Rptr. at 45, 809 P.2d at 820). We therefore hold that the City has not violated Art. I § 4 of the California Constitution. Nor can it be said to have used public funds in violation of Art. XVI § 5 of the California Constitution.
 
 
 50
 Accordingly, we affirm the district court's judgment. The City's request for attorney's fees is denied.
 
 
 51
 AFFIRMED.
 
 
 
 *
 Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The Graham piece was the second of six different pieces the City intended to install as part of its program to reflect the City's diverse heritage
 
 
 [2]
 In Torcaso, in the context of ruling on a state statute requiring notaries to profess belief in God as a condition of office, the Supreme Court assumed without deciding that certain non-theistic beliefs could be deemed "religious" for First Amendment purposes. The Court stated in dictum:
 Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others [citations].
 Id. at 495 n. 11, 81 S.Ct. at 1684 n. 11. Much has been made of this footnote, which has been explained as follows by Judge Canby, concurring in Grove: "The apparent breadth of the reference to 'Secular Humanism' ... is entirely dependant upon viewing the term out of context. In context, it is clear that the Court meant 'no more than a reference to the group seeking an exemption in Fellowship of Humanity v. County of Alameda, 153 Cal.App.2d 673 [315 P.2d 394] (1957) which, although non-Theist in belief, also met weekly on Sundays and functioned much like a church.... Thus Torcaso does not stand for the proposition that "humanism" is a religion, although an organized group of "Secular Humanists" may be.' " 753 F.2d at 1537 (quoting Malnak II, 592 F.2d at 206 & 212 (Adams, J., concurring)). See also Peloza, 37 F.3d at 521 ("neither the Supreme Court, nor this circuit, has ever held that evolutionism or secular humanism are 'religions' for Establishment Clause purposes."), cert. denied, --- U.S. ----, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995).
 
 
 [3]
 See Malnak II, 592 F.2d at 210 (Adams, J., concurring) (cautioning that the indicia should not be regarded as a final "test" for religion)
 
 
 [4]
 Plaintiffs include allusions to Native American religions as part of their New Age argument. While Native American religions may be cognizable under a First Amendment analysis, plaintiffs do not argue that Native Americans worship the Plumed Serpent or Quetzalcoatl. The gravamen of their argument is that the New Age movement is a religion that includes worship of this symbol or deity
 
 
 [5]
 In Wisconsin v. Yoder, the Court distinguished in the Free Exercise context between "religious conviction[s]" and "personal," "isolated" convictions, stressing that the latter do "not rise to the demands of the Religion Clauses." 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972)
 
 
 [6]
 Courts have recognized, but never ruled on, the argument that religion should be defined differently for Free Exercise and Establishment Clause analyses. See, e.g., Peloza, 37 F.3d at 520 n. 5 (citing in dictum United States v. Allen, 760 F.2d 447, 450-51 (2d Cir.1985) (quoting L. Tribe, American Constitutional Law 827-28 (1978)) in favor of bifurcated definition); Grove, 753 F.2d at 1537 (Canby, J., concurring) ("While a generous functional (and even idiosyncratic) definition best serves free exercise values, the same expansiveness in interpreting the establishment clause is simply untenable in an age of such pervasive governmental activity)"; Fleischfresser, 15 F.3d at 687 (noting problem as "unresolved issue"); Malnak II, 592 F.2d at 210-212 (Adams, J., concurring) (favoring single definition); and see 6 Seton Hall Const. L.J. 23, nn. 28-38 and accompanying text (reviewing cases and arguments and urging courts to adopt a single definition); Note, Toward A Constitutional Definition of Religion, 91 Harv. L.Rev. 1056 (1978) (favoring a bifurcated definition). We need not resolve this issue here in light of our conclusion that plaintiffs' suggestion is unworkable under either approach
 
 
 [7]
 Plaintiffs do not argue that the statue has the effect of denigrating religion
 
 
 [8]
 The ceremonial dedication of the statue was apparently intended to promote cultural awareness of Hispanic and Native American traditions. Such cultural events are not uncommonly sponsored by municipalities with Hispanic and Native American components, and cannot seriously be considered to violate the Establishment Clause. Plaintiffs do not argue that the City is promoting the long-dead Aztec religion commemorated by the statue and its dedication ceremony
 
 
 [9]
 The No Preference Clause reads: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed." Art. I § 4. Art. XVI § 5 provides, in pertinent part, that the government may not "make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose...."