Megan **DAUGHERTY** and Donald Sweeny, and Jeffrey A. Seaver and Catherine A. Seaver, and Michelle D. Kintz, individually, and as next friends of their minor children, Plaintiffs,

v.

**VANGUARD CHARTER SCHOOL ACADEMY, a Michigan public school academy, and National Heritage Academies, a Michigan corporation, Defendants.**

No. 198–CV–897.

United States District Court, W.D. Michigan, Southern Division.

Sept. 25, 2000.

Kary Love, Kary Love, Attorney at Law, Holland, MI, for plaintiffs.

William F. Mills, Gruel, Mills, Nims & Pylman, Grand Rapids, MI, Terry J. Mroz, McShane & Bowie, PLC, Grand Rapids, MI, for defendants.

## OPINION OF THE COURT ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McKEAGUE, District Judge.

Plaintiffs are parents of minor children who either attend or have attended elementary school at defendant Vanguard Charter School Academy, a public school managed by defendant National Heritage Academies. Plaintiffs allege that defendants have, through various policies and practices, violated the United States and Michigan constitutional prohibitions against the establishment of a religion. Plaintiffs seek monetary damages and injunctive relief. Now before the Court is defendants' motion for summary judgment.

### I. BACKGROUND

Vanguard Charter School Academy ("Vanguard") is a public school academy in Grand Rapids organized under Part 6A of the Michigan Revised School Code, M.C.L. § 380.501(1). It offers elementary education for kindergarten through eighth grade students. Vanguard has entered into a contract with National Heritage Academies ("NHA"), a Michigan corpora-

tion, under which NHA is "responsible for all of the management, operation, administration, and education at the Academy."

■ Plaintiffs are parents of students who either currently attend or who have attended Vanguard in the past. Four children of plaintiffs Megan Daugherty and Donald Sweeny attended Vanguard during the 1998–99 school year, in the second, third, fifth and sixth grades, but the family has since moved to New Jersey.[1] Jordan Seaver, son of plaintiffs Jeffrey A. and Catherine M. Seaver, attended second grade at Vanguard during the 1999–2000 school year and presumably continues there in third grade this year. Plaintiff Michelle D. Kintz's daughter Alicia attended seventh grade at Vanguard during the 1998–1999 school year and presumably completed eighth grade there in June 2000.[2]

Plaintiffs chose to send their children to Vanguard, they contend, in order to obtain for them an excellent academic education. In this action, plaintiffs allege that their children received more than they bargained for and more than they wanted. Plaintiffs allege that their children have been subjected to numerous and various Christian influences at Vanguard. These influences are alleged to have emanated from actions of school administrators, teachers, volunteers, other students' parents, and students; actions taken pursuant to either policies or customs of defendants tending to promote or condone the endorsement of religion at Vanguard. The actions are thus alleged under 42 U.S.C. § 1983 to have been taken under color of state law, resulting in violation of the Establishment Clause of the First Amendment to the United States Constitution. Plaintiffs also allege the actions resulted in violation of Article 1, section 4 of the Michigan Constitution of 1963, which prohibits the expenditure of State funds for the

---

1. Plaintiffs Daugherty and Sweeny thus acknowledge that they have no continuing claim for prospective injunctive relief.

2. It follows that plaintiff Michelle Kintz also has no continuing claim for prospective injunctive relief.

support of any teacher of religion or religious institution.[3]

Defendants' motion for summary judgment identifies various defects in plaintiffs' claims. The details of plaintiffs' claims are discussed below in connection with resolution of the summary judgment issues.

## II. SUMMARY JUDGMENT STANDARD

■ Defendants' motion for summary judgment requires the Court to look beyond the pleadings and evaluate the facts to determine whether there is a genuine issue of material fact that warrants a trial. Fed.R.Civ.P. 56(c). *See generally Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). That is, the Court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party identifies elements of a claim or defense which it believes are not supported by evidence, the nonmovant must present affirmative evidence tending to show a genuine dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*,

477 U.S. at 252, 106 S.Ct. 2505. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

■ The substantive law identifies which facts are "material." Facts are "material" only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A complete failure of proof concerning an essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

■ "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Id.*, at 323–24, 106 S.Ct. 2548. The rule thus allows the Court, in furtherance of the policy of "securing the just, speedy and inexpensive determination" of civil actions, Fed.R.Civ.P. 1, to conduct a sort of trial on the paper record and exercise some discretion in determining whether a claim or defense is plausible. *See Barnhart*, 12 F.3d at 1389; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480–81 (6th Cir.1989).

## III. STANDING

■ Defendants first challenge plaintiffs' standing to sue in connection with many of the alleged abuses. To demonstrate standing, plaintiffs must show an "actual injury caused by defendants' conduct which can be remedied by a court." *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679, 682 (6th Cir.1994).

### A. Taxpayer Standing

■ Defendants maintain plaintiffs have not expressly asserted taxpayer standing and therefore may not rely on it in seeking

---

**3.** The protection afforded by the Michigan Constitution in this respect has been held to be roughly equivalent to that afforded under the Establishment Clause. *See People v. De-Jonge*, 442 Mich. 266, 273 n. 9, 501 N.W.2d 127 (1993); *Kubik v. Brown*, 979 F.Supp. 539, 557 (W.D.Mich.1997). Accordingly, the analysis that follows applies to both of plaintiffs' claims.

relief. Plaintiffs have alleged that Vanguard is a public school that receives federal and state tax dollars. Plaintiffs have not expressly alleged, however, that they are relying on federal or state taxpayer standing. Nor have they alleged that the conduct challenged in this case results in any substantial expenditure of federal or state tax funds, a prerequisite to taxpayer standing. *See Taub v. Commonwealth of Kentucky*, 842 F.2d 912 (6th Cir.1988).

When the Court identified these omissions at a hearing on plaintiffs' motion for preliminary injunction, February 16, 1999, their counsel expressly acknowledged on the record that plaintiffs were not claiming standing as taxpayers. Yet now, in response to defendants' motion for summary judgment, plaintiffs purport to assert taxpayer standing and request leave to amend their complaint accordingly, if necessary.

In support of the requirement that defendants' challenged conduct be shown to have resulted in a substantial expenditure of tax funds, plaintiffs point to the loss of revenue to the public treasury resultant from defendants' practice of permitting the Lighthouse Baptist Church to use Vanguard School building space after school hours, twice weekly, rent-free. At the hearing on the motion for summary judgment, however, plaintiffs expressly withdrew their claims to the extent they were based on Vanguard's relations with Lighthouse Baptist Church. Review of the existing record reveals no reason to believe that any of the other challenged activities requires any additional expenditure of public funds.

■ Thus, it appears that granting plaintiffs leave to amend so as to expressly assert taxpayer standing would be futile. Considering this futility along with plaintiffs' undue delay in seeking leave to amend, and the unfair prejudice to defendants that would result if the amendment were allowed, the Court, in the exercise of its discretion, denies leave to amend. *See Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir.1994) (discussing relevant factors).

Plaintiffs are thus deemed not to have standing as federal or state taxpayers.

**B. Parental Standing**

Plaintiffs also contend that defendants' wrongful practices have caused them direct injury in the form of interference with their right to inculcate their own religious views in their children. Further, they assert standing to sue on behalf of their minor children, whose freedom of conscience has been infringed by defendants' actions.

■ The Supreme Court has recognized parents' constitutionally protected interest in guiding the religious future and education of their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *see also Fleischfresser v. Directors of School Dist. 200*, 15 F.3d 680, 683–84 (7th Cir.1994). It is also clear that school children who are subjected to unwelcome religious exercises or are forced to assume special burdens to avoid them have standing to complain of an Establishment Clause violation. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 486 n. 22, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ Here, plaintiffs have alleged burdens upon these interests that are direct and personal, not merely hypothetical or abstract, and are clearly sufficient to confer "injured party" standing on plaintiffs. *See Doe v. Beaumont Independent Sch. Dist.*, 173 F.3d 274, 282 n. 20, 283–85 (5th Cir.1999). As defendants correctly argue, however, such standing is limited. Plaintiffs may only obtain redress for wrongdoings which directly affected their children. See *Washegesic*, 33 F.3d at 682–83; *Fleischfresser*, 15 F.3d at 683. Activities and practices that did not directly affect plaintiffs' children, or of which they had no knowledge, cannot be said to have burdened their freedom of conscience or their parents' right to guide their religious upbringing, and are not actionable.

## IV. POLICY OR CUSTOM

 Plaintiffs' grievances are directed at actions of various individuals who have not been named as defendants. Defendants Vanguard and NHA correctly argue that they can be held liable for any such actions only if the actions resulted in a constitutional violation and were taken pursuant to officially executed policy or established custom of Vanguard or NHA. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir.1996). To establish liability based on the existence of a custom, plaintiffs must show that the custom was "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. "In short, a 'custom' is a 'legal institution' not memorialized by written law." *Claiborne County*, 103 F.3d at 508. Further, plaintiffs must also show a direct causal link between the policy or custom and the alleged constitutional deprivation. *Id.*

 Plaintiffs have not specifically alleged or argued that misconduct occurred pursuant to official policy.[4] Neither have they identified any specific customs that had become permanent and well settled at Vanguard. Rather, they contend that NHA, in its management of Vanguard, created a culture in which expressions of Christian belief were and are tolerated and even encouraged. Defendants are thus said to have, through their failure to restrain or correct the resulting excesses, tacitly approved them. To prevail on this theory, plaintiffs must show that the need for corrective action was so obvious that defendants' conscious decision not to act is tantamount to a "policy" of deliberate indifference to plaintiffs' constitutional rights. *Id.* Plaintiffs must also show that

this policy or custom of deliberate indifference was the "moving force" behind the injury alleged. *Id.; see also Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 442 (6th Cir.2000).

## V. ESTABLISHMENT CLAUSE STANDARDS

 In *Santa Fe Independent School Dist. v. Doe*, — U.S. ——, ——, 120 S.Ct. 2266, 2281, 147 L.Ed.2d 295 (2000), the Supreme Court characterized the purpose of the Religion Clauses of the First Amendment as follows:

> The Religion Clauses of the First Amendment prevent the government from making any law respecting the establishment of religion or prohibiting the free exercise thereof. By no means do these commands impose a prohibition on all religious activity in our public schools.... Indeed, the common purpose of the Religion Clauses "is to secure religious liberty."

(Citations omitted). Yet, the Supreme Court has made it clear that alleged violations of the Establishment Clause in elementary school settings are matters of "heightened concern." *Lee v. Weisman*, 505 U.S. 577, 592, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). "The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as free and voluntary choice." *Grand Rapids Sch. Dist. v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). On the other hand, it is equally true that the courts must give due respect to the autonomy and discretion of public school officials, injecting themselves into controversies regarding the daily operation of public schools only if

---

4. On March 15, 199, during the course of this case, and ostensibly prompted by this case, Vanguard formally adopted "Board Policies Regarding First Amendment Issues." Defendants characterize these policies as essentially a codification of the policies and practices which had been in effect at Vanguard. Plaintiffs do not contend specifically that any of the complained of conduct occurred pursuant to any of these policies, before or after they were formally adopted. However, several of these policies are clearly implicated by plaintiffs' claims.

basic constitutional values are "directly and sharply implicated". *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Fleischfresser,* 15 F.3d at 686.

■ In *Sante Fe,* the Supreme Court reaffirmed that Establishment Clause challenges are evaluated with reference to the three factors first articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Santa Fe,* —— U.S. at ——, 120 S.Ct. at 2281. Under *Lemon,* a government-sponsored activity will be deemed not to violate the Establishment Clause if: (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not create an excessive entanglement of the government with religion. *Id.* If a challenged practice fails to satisfy any part of this test, it will be deemed to violate the Establishment Clause. *Coles v. Cleveland Bd. of Educ.,* 171 F.3d 369, 384 (6th Cir.1999).

In evaluating the challenged practices and activities under this test, it is necessary first to identify those practices and activities which resulted in direct injury to plaintiffs for which they seek redress.

## VI. PLAINTIFFS' CLAIMS FOR RELIEF

The prayer for relief in plaintiffs' amended complaint identifies nine objectionable practices. Plaintiffs have withdrawn their objections to two of these practices, concerning defendants' relations with Lighthouse Baptist Church. The Court now addresses the merits of the remaining seven in the order in which they appear in the complaint.

### A. Prayer Services on School Property During School Hours

Plaintiffs ask the Court to enjoin defendants from allowing persons to conduct prayer services on school property during school hours or when students are required to be present. This claim for relief is directed at defendants' past and continuing practice of permitting a parents group called "Moms' Prayer Group" to use the "parent room" in the Vanguard school building.

According to the Vanguard Board Policies, the cooperation and significant involvement of parents in their children's education is encouraged, to enable "all students to reach their full academic potential and develop high moral character for becoming significant members of society." Vanguard Board Policies, Policy 5, Facility Use, Preamble. To accommodate this involvement, a parent room is made available for use by parents of students and parent groups during and after regular school hours, "to provide parents with a place to support the moral and academic excellence in the educational environment at the Academy." *Id.,* Policy 5, Part 2A. Among the parents and parent groups who use the parent room is the Moms' Prayer Group, which has met from 8:30 to 10:00 a.m. on Thursdays. During their meetings, Moms' Prayer Group members read from the Bible, discuss the progress and needs of students, and pray for parents, students, families and teachers.

Although the parent room is off-limits to students, except in case of emergency, plaintiffs' children have been aware of the Moms' Prayer Group prayer activities. This awareness, plaintiffs contend, could translate in the mind of the reasonable elementary student, into the perception that Vanguard endorses religion.

■ Applying the first prong of the *Lemon* test, the Court finds there to be no dispute that the stated policy, generally, of allowing parent groups to use the parent room to facilitate their involvement in the school's educational mission serves a secular purpose.[5] Vanguard's policy, more specifically, of refusing to discriminate against parents or parent groups who wish to use the parent room for prayer also

---

**5.** Unless it appears to be a sham, defendants' assertion of a legitimate secular purpose is entitled to deference. *Brooks v. City of Oak Ridge,* 222 F.3d 259, 262 (6th Cir.2000).

serves the essential secular purpose of maintaining a governmental posture of neutrality toward religion. *See Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 279 (4th Cir.1998). In fact, refusing to permit religious groups to use school facilities open to others would demonstrate hostility toward religion and create even greater risk of impermissible entanglement with religion. *Board of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 248, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). The first prong of the *Lemon* test is therefore satisfied.

The second prong asks whether, considering the totality of the circumstances, the challenged practice, in effect, conveys a message of endorsement or disapproval of religion. *Wallace v. Jaffree*, 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Coles*, 171 F.3d at 384. "If a reasonable observer would conclude that the message communicated is one of either endorsement or disapproval of religion, then the challenged practice is unlawful." *Coles*, at 384–85 (quoting *Chaudhuri v. Tennessee*, 130 F.3d 232, 237 (6th Cir. 1997)).

■ On its face, Vanguard's policy or practice of neutrality (i.e., refusing to prohibit prayer behind the closed doors of the parent room) appears to neither endorse nor disapprove of religion. Obviously, if the practice were reversed, such that parents and parent groups were permitted to use the parent room for any purpose consonant with the goal of encouraging parental involvement *except* prayer, religion would appear to be disapproved, and the effects prong would not be satisfied.

Yet, plaintiffs question defendants' "neutrality." They argue that the Free Thought Association of West Michigan, a group with an "agnostic philosophy," was denied access to the parent room. Defendants explain, in response, that the parent room is made available to all parents of Vanguard students during the school day, regardless of the group's purpose or viewpoint. The Free Thought Association was denied use of the parent room during the day because only one of its members is a parent of a Vanguard student, plaintiff Jeffrey Seaver. The Free Thought Association was invited to apply for use of the parent room during non-school hours as a community-based group, in accordance with the Vanguard Board Policies, Policy 5, Part 5. Plaintiffs have made no objection to the Board Policies. Vanguard's treatment of the Free Thought Association, in accordance with those policies, does not evidence endorsement of religion.

Plaintiffs insist that a reasonable elementary student might draw a different conclusion. Plaintiffs note that the Moms' Prayer Group regularly sponsors luncheons for the school faculty and its members also serve in various volunteer capacities in the school. Thus, plaintiffs argue, Moms' Prayer Group has been allowed to develop such a presence at Vanguard as to potentially give rise to a perception that religion is favored at Vanguard.

■ The Court recognizes that the age of the "audience" is an important factor in the analysis. *Chaudhuri*, 130 F.3d at 239. Elementary school students are impressionable and deserve protection from subtle coercive influences. *Lee*, 505 U.S. at 592, 112 S.Ct. 2649. Plaintiffs' concerns, however, are clearly exaggerated.

What the student "audience" observes in this instance is simply the closed door of the parent room with knowledge that, during a ninety minute period each week, some students' mothers may be praying behind that door. No student is confronted with an invitation to join in the prayer or even to observe it. No student is forced to assume special burdens to avoid the prayer. Any impression that the school endorses the prayer is negated by the fact that the parent room is made available to parents on a non-discriminatory basis for other purposes, too. Moreover, it is not insignificant that Vanguard has, in its Board Policies, expressly declared that "by granting permission for

use of Academy facilities, the Board does not endorse any organization [or] the beliefs of an organization or group." Policy 5, Part 5B. *See Rosenberger v. Rector of University of Virginia,* 515 U.S. 819, 841–42, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (neutrality is evidenced by government's efforts to disassociate itself from private speech).

Under these circumstances, even elementary school children, who are concerned enough about what happens in the parent room to ask and learn the facts from their teachers or parents, can reasonably be expected to understand that Vanguard's tolerance of prayer in the parent room is not endorsement thereof. *See Peck,* 155 F.3d at 287 (holding that policy allowing outside groups to display Bibles in public elementary and secondary schools on the same terms that other literature is displayed by other private groups does not constitute endorsement). As the Supreme Court has noted, "the proposition that schools do not endorse everything they fail to censor is not complicated." *Mergens,* 496 U.S. at 250, 110 S.Ct. 2356.

Accordingly, on this point, the Court finds there is no genuine issue of material fact and concludes defendants' refusal to prohibit prayer in the parent room does not constitute an endorsement of religion.

 To pass the final part of the *Lemon* test, the challenged practice must avoid excessive entanglement of government and religion. To assess entanglement, the Court looks to "the character and purpose of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105; *Coles,* 171 F.3d at 385. Not all interaction between government and religion runs afoul of the Establishment Clause; only *excessive* entanglement. *Coles,* 171 F.3d at 385.

 The Moms' Prayer Group is composed of parents who are concerned about their children's education and who use prayer, among other things, as a means of contributing to the school's educational mission. By making space available to the group on school premises ninety minutes per week, Vanguard enables parental involvement. By allowing the group to meet in a room which students are not allowed to enter, Vanguard appropriately shields the students from potentially unwelcome religious influences. By allowing Moms' Prayer Group members to engage in prayer during their meetings without trying to direct, limit or censor the prayer, Vanguard avoids involvement in the religious activities of the group.

Thus, by maintaining a posture of neutrality, Vanguard has quite simply and properly avoided entanglement with religion. On the other hand, a policy requiring discrimination against or censoring of religious groups would risk the very entanglement which the Establishment Clause prohibits.

Accordingly, the Court finds that Vanguard's refusal to censor prayer in the parent room does not result in excessive entanglement. The practice therefore passes all three prongs of the *Lemon* test and does not, as a matter of law, violate the Establishment Clause or offend the Michigan Constitution.

## B. Participation of Teachers and Staff in Prayer on School Property

Plaintiffs ask the Court to enjoin defendants from allowing Vanguard teachers and members of the administration from participating in or endorsing prayer on school property during school hours or when students are required to be present. The factual support for this claim is not well-developed. It appears to have two components.

 First, plaintiffs cite the deposition testimony of a student's mother to the effect that some Vanguard teachers had been meeting for prayer on school premises before the start of the school day. Apparently, plaintiffs are concerned that their children may view teachers' partic-

ipation in prayer as an endorsement of religion. Inasmuch as the record appears to include no evidence that plaintiffs' children were aware of any teachers' prayer meetings, plaintiffs have no standing to complain. See *supra*, p. 905–06. Yet, even if they did have standing, it does not appear that an Establishment Clause violation could be sustained.

■■■ Teachers do not shed their constitutional rights at the schoolhouse gate. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Granted, the rights of teachers in the public schools are not automatically coextensive with the rights of adults in other settings. *Roberts v. Madigan*, 921 F.2d 1047, 1056 (10th Cir.1990), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992). Generally, however, protected conduct that is not part of the school curriculum or school-sponsored activities may not be restricted unless (1) it would materially and substantially interfere with operation of the school; or (2) in the case of religious activity, students, parents and members of the public might reasonably perceive the activity to bear the imprimatur of the school. *Id.* at 1057; *see also Marchi v. Board of Co-op. Educ. Services*, 173 F.3d 469, 475 (2nd Cir.1999), *cert. denied*, — U.S. ——, 120 S.Ct. 169, 145 L.Ed.2d 143 (1999).

Under the Vanguard Board Policies, teachers are expressly permitted to discuss religious topics as long as such discussions do not occur during instructional time and do not occur in the presence of students. Policy 3, Teachers' Religious Expression, Part 2A. Here, the challenged practice appears to have been consistent with this policy. There is no evidence that Vanguard teachers have met for prayer during instructional time or in the presence of students. There appears to be no evidence that students were even aware of such prayer meetings. There is no evidence or suggestion that teachers were not allowed to meet on school premises and discuss other matters not related to school

business. *Cf. May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105, 1118 (7th Cir.1986) (upholding right of school authorities to prohibit teachers' prayer meeting before school day began where school had never been used for meetings not related to school business). Under these circumstances, there is no factual support for the conclusion that Vanguard students might reasonably perceive a teachers' prayer meeting as reflecting the school's endorsement of, rather than neutrality toward, religion.

The second component of this claim relates to the presence of two teachers in open prayer meetings at the school flagpole prior to the start of the school day. The claim appears to be based entirely on the deposition testimony of Alicia Kintz. During the 1998–99 school year, she had occasionally observed students, eight to ten in number, and at least two teachers sitting and praying at the flagpole at the north entrance to the school at about 7:30 a.m. She believes these flagpole gatherings took place about once a month. She does not know who organized them, but she believes "teachers aren't supposed to [attend]." Alicia Kintz Dep.Tr. p. 9. Alicia has never attended a flagpole gathering, so she does not know who spoke or what was discussed or prayed about. Her knowledge of the flagpole gatherings has not really affected her one way or the other. *Id.*, pp. 12–13.

■■■ The presence of teachers and elementary students together, for prayer, on school premises, albeit during non-instructional hours, is a matter of heightened concern. Young students tend to emulate their teachers as role models and are susceptible to peer pressure. *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Yet, plaintiffs have failed to adduce evidence to support a reasonable finding that two teachers' mere presence at flagpole gatherings might be reasonably perceived as the schools' endorsement of prayer or religion.

As the Supreme Court observed in *Mergens*, 496 U.S. at 253, 110 S.Ct. 2356, "custodial oversight of the student initiated religious group, merely to ensure order and good behavior, does not impermissibly entangle government in day-to-day surveillance or administration of religious activities." Thus, if the teachers attended the flagpole gatherings strictly in a passive or supervisory capacity without participating in the prayer, their mere presence would not be violative of the Establishment Clause. *See Herdahl v. Pontotoc County Sch. Dist.*, 933 F.Supp. 582, 590–91 (N.D.Miss.1996).

■ If, on the other hand, the teachers played a more active, participatory role in the prayer gathering, of which there is no evidence, then plaintiffs' claim would be stronger. Yet, such conduct by the teachers would be violative of Vanguard Board Policies, which expressly prohibit teachers' expression of religious belief in the presence of students. Policy 3, Teachers' Religious Expression. It follows that defendants could be held responsible for such teacher misconduct only if plaintiffs also showed that the need for corrective action was so obvious as to demonstrate that defendants were deliberately indifferent to and tacitly approved the misconduct. Plaintiffs have failed to present evidence to support such a finding.

Accordingly, with respect to plaintiffs' request for an injunction prohibiting prayer by teachers on school property, the Court concludes there is no genuine issue of material fact and that defendants are entitled to summary judgment.

## C. Distribution of Religious Materials

■ Plaintiffs ask the Court to enjoin defendants from allowing the distribution of religious materials at Vanguard during school hours or when students are required to be present. Defendants do not dispute that Vanguard has allowed community groups, including religious groups, to distribute materials to students in the "Friday folders" which the students take home with them. The Board Policies provide, in pertinent part:

It is the policy of the Vanguard Board of Directors to allow community groups to distribute information that may be relevant to the students and parents regarding community activities and events. The Academy will not approve the distribution of information regarding events or activities that conflict with the educational program of the Academy or promote illegal conduct, hatred or violence.

. . . .

The Academy's policy is content-neutral except for the specific prohibitions contained in these guidelines.

Policy 4, Academy Distribution of Non–Curriculum–Related Literature.

Again, Vanguard's policy and practice bespeak neutrality, not endorsement. The Fourth Circuit recently responded to a claim similar to plaintiffs' as follows:

[T]he Board's decision that religious speech is one of many kinds of speech that is consistent with the school's educational mission and that is appropriate for students to hear if they so choose does not evince the favoritism of religion that the Establishment Clause condemns. Rather, to require the Board to exclude religious literature as such from the forum it has created to further the schools' educational mission by exposing the county's students to a variety of age appropriate private speech would evince the hostility toward religious speech that the Establishment Clause does not require and the Free Exercise and Free Speech Clauses forbid.

*Peck*, 155 F.3d at 284. The Court finds this reasoning directly applicable and compelling.

If defendants manipulated the facially neutral policy so as to give preferential access to religious literature or certain religious literature, then an Establishment Clause violation might be made out. *Id.* However, the present record is devoid of any such evidence of favoritism or discrimination among community groups who wish

to disseminate appropriate materials. Accordingly, the Court finds there is no genuine issue of material fact and that defendants are entitled to summary judgment with respect to this claim as well.

### D. Religious Content of In–Service Training for Teachers and Administrative Staff

■ On October 23, 1998, plaintiff Jeffrey Seaver attended a moral focus retreat, a day-long in-service training event, which all Vanguard teachers and administrators were required to attend. Seaver attended as a member of Vanguard's moral focus parent committee and found certain items on the day's agenda objectionable.

The purpose of the in-service training, defendants explain, was to instruct teachers on the use of historical heroes to teach character and moral development. Seaver contends the retreat opened with a song whose lyrics were drawn in part from Bible passages. He also observed that lunch was preceded by a brief Christian prayer. During lunch, Seaver tape-recorded an address by Reverend Dr. John Reist, a Baptist minister, on the topic of moral absolutes. The partial transcript of the presentation reveals references to Benjamin Franklin, Thomas Jefferson, Jesus, and Socrates, as well as several references to writings in the Old and New Testaments of the Christian Bible. Concerned that any such Christian influences will be incorporated into the Vanguard curriculum, plaintiffs ask the Court to enjoin defendants from using religious materials in future mandatory in-service training events.

It is undisputed that no students attended the October 23, 1998 moral focus retreat. Neither is there any evidence that any of the complained of religious influ-

ences directly became a part of Vanguard instructional materials or otherwise affected any of plaintiffs' children. Plaintiffs have thus failed to show an actual injury caused by defendants' conduct which can be remedied by the Court. They therefore lack standing to complain of the content of Vanguard's in-service training. It follows that defendants are entitled to summary judgment on this claim for relief.

### E. Religious Music

■ Plaintiffs also ask the Court to enjoin defendants from including religious music or prayers at official school functions. At the hearing on defendants' motion for summary judgment, plaintiffs' counsel explained that this claim was precipitated by events which occurred on December 4, 1998, at the annual Christmas party for all NHA employees.

There is no allegation or evidence that any Vanguard students were present at the party and no evidence that any religious music or prayers aired at the party directly affected any of plaintiffs' children. Inasmuch as plaintiffs' standing is derivative of their children's freedom of conscience, which appears not to have been directly and personally burdened by the complained of music and prayer, it is clear that plaintiffs also lack standing to pursue this claim. Summary judgment will therefore be awarded to defendants.

### F. Teaching Morality from Religious Viewpoint

■ Vanguard was chartered "to create a learning environment that enables students to realize their full academic potential, develop high moral character and become contributing members of society." Declaration of Moral Purpose for Vanguard Charter Academy.[6] In furtherance

---

**6.** The full text of the Declaration is as follows:

Vanguard Charter Academy (VCA) has been chartered, "To create a learning environment that enables students to realize their full academic potential, develop high moral character and become contributing members of society". This means that VCA is not just a school with a strict discipline

code, but a place where the moral character of the students is developed through the curricula, the teachers, activities and parental example. It is self-evident, needing no defense, that character development and moral integrity are necessary for an orderly society and therefore in education as well.

of the character development objective, Vanguard has employed a "Moral Focus Curriculum," based on the four Greek cardinal virtues: prudence, temperance, fortitude and justice. These four virtues are deemed to embody "certain moral principals, common to all, that transcend time."

In these four virtues, defendants purport to have identified nine elements. Derived from "prudence" are respect and wisdom. From "temperance" are derived gratitude, self-control and encouragement. "Fortitude" includes courage and perseverance. Finally, "justice" embodies compassion and integrity. Pursuant to the Moral Focus Curriculum, one of these nine virtues is given special emphasis by Vanguard teachers each of the nine months of the school year.

Plaintiffs do not object to Vanguard's emphasis on moral character development. Nor do they object to the Moral Focus Curriculum generally; or even to the Greek cardinal virtues. It is the manner in which the virtues are defined and then translated through "key words" that concerns plaintiffs. For instance, plaintiffs question the association of key words like "merciful," "compassion," "kindness," "forgiveness," and "grace" with the virtue justice. They also question the association of key words like "moral strength," "conscience," "faith" and "self-sacrifice" with the virtue fortitude. Some of these concepts, plaintiffs contend, evince an agenda beyond that contemplated by classical Greek philosophers. Some of the concepts, plaintiffs contend, are not derived from Greek philosophy at all, but from Christianity. They ask the Court to enjoin defendants from using the moral focus agenda to endorse a religious viewpoint.

First of all, the Moral Focus Curriculum, as it has been defined in the present record, does not, on its face, expressly mention or even hint at religion per se. In fostering moral character development and good citizenship in students, the Moral Focus Curriculum has a laudable secular purpose. There is no dispute that the Moral Focus Curriculum satisfies the first prong of the *Lemon* test.

Nor can the Moral Focus Curriculum, read at face value, reasonably be deemed to convey the message to a reasonable observer that Vanguard either endorses or disapproves of religion. The fact that the curriculum employs words and concepts in service of character development that happen to coincide or harmonize with the tenets of some or all religions, does not necessarily betoken endorsement. *See Fleischfresser,* 15 F.3d at 689. Plaintiffs maintain, however, that the curriculum opens the door to excesses. In *effect,* plaintiffs contend, the opportunity to teach virtue is exploited by teachers to teach religion.

As a public school VCA's moral focus cannot be religious in nature. The commonly held, historic values of our community, regardless of religious conviction, are the strong base on which the parents and staff of VCA can build. The virtues of honesty, loyalty, friendship, kindness, generosity, fairness, perseverance, forgiveness, self-control, respect, patience, compassion and tolerance are to be taught and honored as worthy goals for our children.

While VCA can not be hostile to religion, neither can it prefer any one religion over another. Nor should all religious expressions be barred from the campus. Rather, an attitude of tolerance for religious views other than our own is to be taught as a part of morality. In this VCA has an opportunity to set an example of the balance between freedom and responsibility, and how people of differing beliefs can work together towards a common goal.

The encouragement of virtue is to be seen as a vital part of the life and activities of VCA, not just something we say we believe in but go no further to implement. We will do nothing to discourage the attaining of these virtues, but will do all in our power to aide the development of them. Only the curricula, activities, materials and resources that best serve the goals of the school's moral focus education should be selected.

From this initiative, we hope to develop within each student the capacity to be a disciplined, self-reliant and compassionate citizen, capable of embracing the needs and concerns of all people.

If such excesses have occurred; if Vanguard teachers have used the Moral Focus Curriculum to teach or endorse religion, such conduct would appear to have been taken in derogation of Vanguard's Declaration of Moral Purpose and in violation of Vanguard Board Policies. The Declaration explicitly states that Vanguard's moral purpose "cannot be religious in nature." Rather, it is to be based on "commonly held, historic values of our community, regardless of religious conviction." *Id.*

Similarly, the Board Policies require a posture of neutrality toward religion: "neither a preference for any one religion over any other nor a preference shown for religion over non-religion or for non-religion over religion." Policy 1, Teaching About Religion. The Board Policies recognize the legitimacy of teaching "*about* religions and the role and influence of religion in history, literature, art, music, science or any other area in which religion has played a role," but caution that:

Such teaching should:
1) foster knowledge about religion, *not indoctrination into religion;*
2) be academic, *not devotional or testimonial;*
3) promote awareness of religion, *not sponsor its practice;*
4) inform students about the diversity of religious views *rather than impose one particular view;* and
5) promote understanding and respect *rather than divisiveness.*

*Id.* (emphasis added). This policy appears to be consistent with the Establishment Clause. *See School Dist. of Abington v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (recognizing value of study of comparative religion in public schools).

In all respects, Vanguard's policies suggest only neutrality, not endorsement. If teachers have violated these policies, in such a way as to infringe plaintiffs'

rights by effectively endorsing religion, defendants can be held liable therefore only if they have tacitly approved such abuses through their deliberate indifference. *Claiborne County,* 103 F.3d at 508. Plaintiffs cite three examples of such abuses that directly affected their children.

In the first of these examples, Kristin Sweeney remembered that in fifth or sixth grade, a fellow student had offered a "Veggie Tales" children's animated videotape for viewing by the class around Christmas time. The videotape related to the origins of Christmas and the birth of Jesus. The teacher, Jane Riley, allowed the class to view the tape, but did not say anything about it. Kristin mentioned this to her mother, who made inquiry and was told by the teacher that she permitted the viewing of the tape in her course on world religions and did not believe it was inappropriate.[7]

This episode hardly suggests endorsement of religion. As Kristin Sweeney recognized, the tape was not an ordinary part of the curriculum, but was offered by a student. The teacher did not use it as a springboard for indoctrination, but rather appears to have made no comment about it to the class. Insofar as it was considered by the class in conjunction with materials concerning other religions' holiday traditions, any risk that Christianity might have been perceived as specially enjoying the school's approval appears to have been minimized. Viewed in the totality of the circumstances, therefore, the need for corrective action, if any, cannot be said to have been so obvious as to demonstrate a policy of deliberate indifference on the part of defendants.

In plaintiffs' second example, two of plaintiffs' children, Ben Sweeny and Charlie Sweeny, recall having heard Bible stories read aloud by parent volunteers during the lunch recess while they were

---

**7.** This explanation is corroborated by defendants' response to a request for admission, explaining that the video was shown in conjunction with study of Jewish and Islamic holiday traditions also.

present in the classroom. This appears to be a questionable practice. The record discloses little about the circumstances surrounding these occasional Bible readings; e.g., regarding the purpose of the readings—whether to instruct or simply to entertain—and whether stories from other sources were also read.[8] Yet where the reading was done by parents, not teachers, during non-instructional time when children were free to listen or not, the practice hardly justifies a reasonable perception of religious endorsement by the school. After all, the Establishment Clause does not prohibit *private* speech endorsing religion. *Santa Fe*, —— U.S. at ——, 120 S.Ct. at 2275. Moreover, there is no evidence that the school administration was made aware of the parents' practice and either rebuffed or ignored any complaints. The present record simply could not support a reasonable finding that any injury flowing from this practice is attributable to defendants because of their deliberate indifference.

 In the third example, Jordan Seaver recalled a substitute teacher having read two stories to him relating to Jesus' birth, "The Crippled Lamb" and "The Upside Down Crown." It is undisputed, however, that upon learning of this, Vanguard Principal Alan Couch instructed the substitute teacher not to read stories of this nature in the future. The need for corrective action was appreciated and appropriate corrective action was taken. Plaintiffs have thus failed to show that defendants were deliberately indifferent.

From the foregoing discussion of these three alleged excesses, it is clear that any perceived endorsement of religion did not occur pursuant to policy or custom and is not attributable to defendants.

With reference to the third prong of the *Lemon* test, plaintiffs insist the Moral Focus Curriculum creates impermissible government entanglement with religion. Opening the school to instruction about religion under the auspices of character development, plaintiffs contend, requires government to be pervasively involved in matters of religion.

 Indeed, the Moral Focus Curriculum demands vigilance and diligence of defendants to ensure that Vanguard's policy on Teaching About Religion is carefully adhered to. There are risks that the line between teaching virtue or "teaching about religion," on the one hand, and "teaching religion," on the other hand, will not always be perfectly observed. Yet, the mere possibility that a policy *may* be unconstitutionally applied does not alone render it invalid. *See Bowen v. Kendrick*, 487 U.S. 589, 612, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

In this case, the Court has found insufficient evidence to sustain an Establishment Clause violation. Moreover, the Vanguard Board Policies Regarding First Amendment Issues are uniquely significant in this regard. By establishing explicit and comprehensive guidelines for Vanguard teachers and administrators to follow, defendants have undertaken meaningful steps not only to prevent unconstitutional conduct by teachers, but also to avoid excessive entanglement.

In *Lee*, 505 U.S. at 598, 112 S.Ct. 2649, the Supreme Court observed that "[o]ur society would be less than true to its heritage if it lacked abiding concern for the values of its young people." The *Lee* court also acknowledged the notion that there must be a place in the student's life for precepts of morality. *Id.* Further, the Supreme Court has held that the Constitution does not prohibit all references to religion in the public schools. *Santa Fe*, —— U.S. at ——, 120 S.Ct. at 2281. In fact, the relentless and pervasive effort to exclude religion from public life could itself be inconsistent with the Constitution. *Lee*, 505 U.S. at 598, 112 S.Ct. 2649.

In the Vanguard Declaration of Moral Purpose, the Moral Focus Curriculum, and the Vanguard Board Policies, defendants

---

8. "[E]ven the Bible itself may be used in public schools to teach literary and historical lessons." *Abington,* 374 U.S. at 225, 83 S.Ct. 1560.

have made a serious and sensible effort to reconcile these competing dynamics. In this case, implementation of these policies has not been shown to have resulted in any violation of the Establishment Clause. Accordingly, the Court finds no grounds to interfere with defendants' implementation of the Moral Focus Curriculum.

### G. Creationism

Finally, plaintiffs ask the Court to enjoin defendants from allowing the teaching of creationism as an accepted scientific theory at Vanguard. Plaintiffs do not offer a definition of "creationism." It appears to refer to the belief or theory that the universe was created by a supernatural creator. *See Edwards v. Aguillard,* 482 U.S. at 591–92, 107 S.Ct. 2573 (defining "creation science" under Louisiana's Creationism Act). To allow the teaching of creationism, plaintiffs contend, is to allow indoctrination in religion.

■■■ Plaintiffs' claim is premised on two episodes. In fourth grade, Charlie Sweeney remembered a visiting teacher, Randy Creswell, "the science guy," having responded to a student's question about the origin of atoms by referring to God. "He always just answered the questions that he wasn't certain on by using the word God." C. Sweeny Dep.Tr. pp. 16–17.

In fifth grade science class, Charlie recalls the teacher Douglas Dewey having suggested that "evolution isn't true or something". *Id.,* pp. 28–30. The issue apparently arose in connection with preparation for a MEAP (Michigan Educational Assessment Program) test. Apparently, Dewey was critical of the form of a preview test question concerning evolution. Charlie did not remember Mr. Dewey ever having talked about religion. *Id.*

Neither of these episodes, standing alone, suggests that creationism has been taught as an accepted scientific theory at Vanguard. In both instances, the complained of "teaching" appears to have been triggered by particular circumstances that arose in the classroom and not by an official policy or custom expressly requiring

or allowing the teaching of creationism. Defendants have submitted Creswell's lesson plans on evolution and fossils; they include no reference to God or creationism. Dewey has explained that when students have asked questions about evolution or creation, he has remarked "that those are two schools of thought of how the world has begun, and we go on." Dewey Dep.Tr. p. 8. There is no evidence to suggest that such anecdotal discussions of evolution or creation reflect a policy of endorsement of religion.

In *Edwards,* the Supreme Court invalidated Louisiana's Creationism Act because it was "designed *either* to promote the theory of creation science which embodies a particular religious tenet by requiring that creation science be taught whenever evolution is taught *or* to prohibit the teaching of a scientific theory disfavored by certain religious sects by forbidding the teaching of evolution when creation science is not also taught." 482 U.S. at 593, 107 S.Ct. 2573 (emphasis in original). The court noted that teaching a variety of scientific theories about the origins of humankind to school children is not necessarily impermissible—"if done with the clear secular intent of enhancing the effectiveness of science instruction." *Id.* at 594, 107 S.Ct. 2573. "The Establishment Clause, however, 'forbids *alike* the preference of a religious doctrine *or* the prohibition of theory which is deemed antagonistic to a particular dogma.'" *Id.* at 593, 107 S.Ct. 2573 (quoting *Epperson v. Arkansas,* 393 U.S. 97, 106–07, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)) (emphasis added in *Edwards* ).

There is no evidence that defendants have employed a policy of either preferring the teaching of creationism or restricting the teaching of evolution. Again, Vanguard appears to have maintained a posture of neutrality. Because Vanguard does not prescribe a defined science curriculum, both Creswell and Dewey purportedly attempted to conform their instruction to the National Science Standards as interpreted by the State of Michigan.

Their incidental references to God and creationism do not even come close to so directly and sharply implicating constitutional values as to warrant judicial intrusion into defendants' management of the Vanguard curriculum. *See Fleischfresser*, 15 F.3d at 686 (recognizing local school boards' broad discretion in matters of education).

Accordingly, defendants are, with respect to this claim as well, entitled to summary judgment.

## VII. CONCLUSION

The Court has thus duly considered the evidence adduced by plaintiffs in support of their various claims that defendants have violated the United States and Michigan Constitutions and has found the evidence wanting. In connection with those practices with respect to which plaintiffs have standing, they have presented no more than a mere scintilla of evidence to support a finding that any constitutionally impermissible conduct occurred pursuant to defendants' policies or customs. This is insufficient to forestall summary judgment. Accordingly, defendants' motion for summary judgment will be granted in all respects. A judgment order consistent with this opinion shall issue forthwith.

## JUDGMENT ORDER

In accordance with this Court's written Opinion of even date,

**IT IS HEREBY ORDERED** that the motion of defendants Vanguard Charter School Academy and National Heritage Academies for summary judgment is **GRANTED;** and

**IT IS FURTHER ORDERED** that summary judgment is hereby **AWARDED** to defendants on all of plaintiffs' claims against them.